ROBERT L. BLAND, Judge.
In this proceeding the New River and Pocahontas Consolidated Coal Company, a corporation, has presented to this court for consideration and adjudication a claim against the state for $181,536.78. It is contended that the entire claim— with the exception of two items thereof aggregating $2,206.04 representing two estimates for work done on other roads— is for money paid for labor, materials and supplies (used along with county funds) in constructing that part of what is now route no. 41, in Fayette county, between Clifftop and Layland. Claimant admits that the labor was done and the materials and supplies furnished during the calendar years 1927, 1928 *211 and 1929, while county-district roads were still being built by county courts and before they were transferred to the state road commission by statute.
State route no. 41 is a hard-surfaced highway throughout its entire length, and the only modern south highway crossing the Midland Trail between Rainelle on the east and Gauley Bridge on the west, a distance of approximately fifty-five miles. The route begins at Beckley, in Raleigh county, and runs through Summersville to Craigsville, in Nicholas county. It connects at Beckley with federal highways nos. 19 and 21 and state routes nos. 3 and 16, and crosses the Midland Trail (federal highway no. 60) near Clifftop, in Fayette county. At Summersville it connects with federal highway no. 19 and state route no. 39. At Craigsville it connects with state routes nos. 20 and 43. Babcock State Park and the Negro 4-h Camp are on this highway.
Claimant says that it expended its money in good faith and for the public good, in the construction of that part of the road between Clifftop and Layland, and that its claim, in equity and good conscience, should be discharged and paid by the state.
The claim has been very carefully and resourcefully prepared and most ably presented. Let us, therefore, examine the circumstances and conditions under which it arises in order that we may understand more clearly why claimant should have expended so large an amount of money in the construction of a county-district road, exclusively under the supervision, control, construction and maintenance of the county court of Fayette county. What reason or reasons were responsible for the magnanimity and generosity of claimant in paying out so vast a sum of money for the benefit and convenience of Fayette county when a county court could not expend any money or incur any obligation or indebtedness which was not expressly authorized by law to be expended or incurred? Code, 1923, chapter 28A, section 12. We quote from claimant’s petition as follows:
*212 “To understand the reasons why the Coal Company thus advanced money to build a county-district road requires a review of the road building history of Fay-ette County. For many years the principal industry in Fayette County has been coal mining. In the development of that industry, various branch line railroads were built into the coal fields and numerous coal mines were opened along these branch lines. At substantially all such mines, towns were built to house the coal mine employees. Some of these towns were of considerable size, with hundreds of families. The only means of ingress and egress to the majority of such towns, for both persons and property, was by railroad. Service was infrequent on branch lines and movement of persons, mail or property to or from the county seat or the State Capitol, or elsewhere, required changes at junction points with attendant delays and inconveniences. At about the same time, automobiles, buses and trucks became the popular mode of travel and transportation. Citizens of isolated towns demanded roads. As early as 1916, Fay-ette County embarked upon an ambitious road building program. From time to time bond issues and succeeding bond issues to the limit allowed by law were voted in all of the magisterial districts, but the money was insufficient and the parts of roads built with it often ended in wild country and for practical purposes were little, if any, better than no roads at all. To complete the roads with funds available from annual levies would have required many years. The need for roads was so great and the demands therefor were so insistent, that some means to build them had to be found.
“With the knowledge and tacit approval of individual members of the County Court, the County Road Engineer made private arrangements with banks, coal companies and individuals to advance money needed to pay for road construction work, whether done by jail labor or by contractors, upon assignments of estimates, bills and invoices, and to withhold presenting any claims to the County Court until some future date. The money was to be advanced without regard to whether the estimates, bills and invoices were or were not lawful claims against the *213 County under Sec. 12, Chap. 28A, Code of 1923. The money advanced by the Claimant was advanced pursuant to a preexisting understanding and arrangement with the individual members of the County Court of Fayette County, but not officially as a court. Such understanding and arrangement also contemplated dedication by Claimant of rights of way over its lands free of charge.”
In 1924 the county court appointed one George H. Siems as county road engineer and conferred upon him wide authority and extensive powers. By a subsequent order the said Siems was constituted ex officio road supervisor of the county. With the consent of the county court he was given authority to establish a county system of maintenance for all roads within the county. He was given supervision of convict labor for roads within the county and directed to use such convict labor for the construction and maintenance of such roads as he deemed necessary. In December 1925, said county road engineer submitted to the county court a plan entitled “Proposed County System of Roads.” This plan prescribed two main county roads numbered, respectively, 1 and 2. Route No. 1 commenced at Deepwater by way of Page Mountain, Kincaid, Wriston to Oak Hill. Route no. 2, otherwise known as New River Highway, began at the state highway at Glen Jean via Thurmond, Stone Cliff, Quinnimont, Layland, Danese to the Midland Trail at Cliff top.
The county court deeming the roads embraced in routes 1 and 2 as the most important connecting roads in the county, the county road engineer was ordered to make necessary alignment, earth work, structures and right of way surveys and prepare necessary plans therefor; to acquire a forty foot unobstructed right of way, with additional width to construct slopes for cuts and embankments. It was provided that the said two routes comprising the main system of roads in the county as prescribed by the plan submitted by the county road engineer to the county court, should have a grade width of not less than 25 feet and a surface width of not less than 15 feet. The grade was not to exceed 8% and the degree of *214 curvature was not to be in excess of 45 degrees. All of this was done before state route no. 41 had been officially designated and when the construction and maintenance of county roads was exclusively within the province of the county court of Fayette county. Thus it will be seen that at the time that claimant made its expenditures for which it now seeks reimbursement the county-district road between Clifftop and Layland had not been officially designated as any part of state route no. 41. This section of road was not taken over by the state road commission until July 1, 1933, under chapter 40, acts extraordinary session of the Legislature of 1933.
Claimant admits in its petition that “At the outset, it was definitely understood that the monies so advanced would be in excess of the contractual capacity of the county court, and therefore would not constitute any legal debt or obligation of the county or of any magisterial district therein”; and, further, that at the end of each month as the work progressed the county road engineer “prepared a statement showing the amounts that had accrued during the month for wages of skilled labor and the cost of equipment, materials and supplies. These statements were examined by the county court and approved, but such approval was not in writing. Written approval by the county road engineer was, however, placed on the statements at the direction of the county court and signed by said engineer. The money to pay the amounts shown on the statements was thereafter placed in the hands of the said county road engineer by New River and Pocahontas Consolidated Coal Company and he disbursed it to the several persons entitled to receive it.”
Claimant’s petition further avers:
“In January, 1927, New River and Pocahontas Consolidated Coal Company began to buy estimates and bills included' in this claim. In June, 1927, it signed a contract to build a portion of Route 41. In May, 1928, it signed a similar contract with another contractor. These contracts were on the usual forms used *215 for county road contracts, the specifications for the work were prepared by the County Road Engineer and the contracts were approved by the County Court and the County Road Engineer and were actually signed in the office of the Prosecuting Attorney in the presence of the members of the County Court, but the county was not a formal party thereto. This practice was not confined to the one instance. During the same period, other roads were constructed under other contracts signed by other contractors and other coal companies. As stated above, such other coal companies have been repaid what they advanced and New River and Pocahontas Consolidated Coal Company is the only coal company that has not been repaid. The contractors did their work under the supervision and control of the County Road Engineer. All estimates were submitted to the County Court and checked by the County Road Engineer and approved in writing by him at the direction of the Court.”
It is plainly manifest upon its own showing that claimant was a party to an understanding or arrangement with the county court and the county road engineer that amounted to a total disregard of the statute restricting the expenditures of the county’s money for road purposes to what was potentially available for lawful disposition by the court. It expected to be reimbursed ultimately for the amount of its expenditures by the county, not the state. In making the expenditures in question it knew that the money might never be repaid. In paying out its money it took a gambler’s chance upon its repayment. The claim is not now and never was an obligation of the state. The state was not a party to the arrangement under which the money was advanced. At the time of the outlay of the money by claimant it was never anticipated that it should be repaid by the state. It looked alone to the county to reimburse it as the county had reimbursed other coal companies and banks which had advanced moneys under the county’s plan for road building. Claimant cannot consistently invoke the rule of equity and good conscience in this court. He who seeks equity must do equity. Claimant was under no legal obligation to expend its money for the building of this *216 county-district road. In doing so it was a mere volunteer. Equity follows the law. Apparently the idea of reimbursement by the state never occurred to claimant until after the decision of the Supreme Court of West Virginia in the case of Love v. New River and Pocahontas Consolidated Coal Company, 119 W. Va. 222, 193 S. E. 59. That case involved certain county drafts held by claimant. The payment of these drafts had been enjoined by the circuit court of Fayette county. While it is true that upon the particular facts involved and showing made in the case the appellate court reversed the decree of the lower court enjoining the payment of the HarVel drafts and approved the action of the court in dissolving the injunction against the payment of the Gentry drafts (all of which drafts were held and owned by claimant), no such drafts are involved in this proceeding. In the opinion in the Love case, Judge Hatcher says:
“For several years prior to 1928, the county court had entertained an ambitious road-building scheme, far beyond its current resources. In consummating this scheme, the court had permitted several parties, including the Company, to advance money for road building with the expectation that the court would make repayments later whenever its resources should permit. The origin of this arrangement is nebulous and at best it was only a gentlemen’s agreement. If such, it involved the levies of future years, and its illegality, under Code 1923, Chapter 28A, Section 12, is conceded by the Company, and an unpaid balance of more than $185,000.00 advanced by it under the arrangement is regarded as ‘gone with the wind.’ ”
Can it be said that upon the facts submitted to us in support of this claim for $181,536.78, the state would be liable therefor, if suable, at law or in equity? It is my personal view — but not now expressed as the judgment of the court— that where no liability exists upon which the state can be sued, at law or in equity, if it were suable, the court of claims has no jurisdiction to make an award, except possibly in cases submitted under the “shortened procedure” provision, of the *217 court act wherein the state agency involved concurs in the claim and it is approved by the attorney general as one that should be paid. The determination of that question, however, is not essential to the disposition of the claim under consideration.
It appears from the record that at the time of the expenditure of its money claimant owned a large acreage of coal and mineral land and operated mines in close proximity to the Clifftop-Layland road. The distance between Clifftop and Layland is approximately twelve miles. The road extends through claimant’s land for a distance of about three and one-half miles. Much of the work done with claimant’s money was on its own land. Claimant had agreed to dedicate the road right-of-way under the terms of the “gentlemen’s agreement.” The section of the road between Clifftop and Layland became a part of state route no. 41 in 1933, as above stated. Since that time the state has used the road in question continuously as a part of state route no. 41. The statute made it the duty of the county court to procure rights of way. The order of the county court cited directed the county road engineer to obtain all necessary rights of way.
The attorney general has moved to dismiss the claim on the ground of want of jurisdiction in the state court of claims to entertain the same and upon other grounds unnecessary to be considered, in view of our determination of the claim.
One F. O. Trump instituted an action of trespass on the case in the circuit court of Jefferson county against the state road commission. He sought damages claimed to have resulted from the alteration of the grade of a state highway in that county. The circuit court sustained a demurrer to the plaintiff’s declaration. Certain questions of law arising thereon were certified to the Supreme Court. The case was decided there on November 26, 1935. It is reported in 116 W. Va. 625, 182 S. E. 760. The fourth question certified reads:
*218 “Is the State Road Commission liable for the cost of acquiring rights of, way for a state roadi and damages to land caused by its construction, repair, and maintenance thereof, acquired or damaged prior to May 16, 1933?”
The Supreme Court answered the question in the following syllabus:
“Prior to the effective date (May 16, 1933) of Chapter 40, acts of the First Extraordinary Session of 1933, the right of action, under Code, 17-4-4, for damages to land growing out of the construction, alteration, or repair of a state road, arose, if at all, exclusively against the county court of the county in which the land lay.”
Judge Kenna, in delivering the opinion in that case, said:
“Going at once to the certified question which, in our opinion, disposes of the case here, we find that the fourth question propounded is, in effect, whether the State Road Commission is liable for the damages declared on incurred by the plaintiff prior to the effective date of Chapter 40 of the Acts of the First Extraordinary Session of the Legislature of 1933, sometimes referred to as the secondary road law. It is not necessary, we believe, for us to decide, in this case, whether the act last referred to effected a change in existing law with reference to the right to sue the State Road' Commission in an action of tort. The right of action here, according to the question certified, arose prior to the effective date of that act. Therefore, at the time the right of action arose, under the authority of Kinney v. County Court, 110 W. Va. 17, 156 S. E. 748, and other West Virginia cases readily available, the right of action lay, if at all, against the county court of Jefferson County exclusively. See, also, Hatcher v. County Court, 115 W. Va. 95; 174 S. E. 690. We, therefore, hold that the action of the Circuit Court of Jefferson county in sustaining the demurrer to the plaintiff’s declaration must be affirmed solely on this ground.”
*219 We , are of opinion that the claim in question is controlled by the above cited case.
We, therefore, hold that the state court of claims is without authority to make an award reimbursing a coal company which had voluntarily advanced money prior to May 16, 1933, the effective date of chapter 40 of the acts of the first extraordinary session of the Legislature of 1933, for the payment of labor, materials and supplies (used along with county funds) in the construction of a county-district road in West Virginia, notwithstanding that such county-district road for which such moneys were expended has since become an integral part of the state system of highways; and a claim asserted against the state for such reimbursement will be denied and dismissed.
To make an award in this case, if we had jurisdiction to do so, would create a dangerous precedent. If the remaining fifty-four counties of the state should adopt the same method of road building as shown in this case to have' been followed in Fayette county, and file like claims in this court for reimbursement, such a course of procedure could easily result in the bankruptcy of the state.
An award is denied and the claim dismissed.